(163 App. Div. 199)

### JARVIE v. ARBUCKLE et al.

(Supreme Court, Appellate Division, Second Department. June 5, 1914.)

1. PARTNERSHIP (§ 311*) — DISSOLUTION AGREEMENT — CONSTRUCTION — INDEBTEDNESS.

   The provision in a partnership dissolution agreement that plaintiff, the retiring partner, should be paid the value of his share as of January 1, 1906, required that an accurate account should be taken to determine such value, and in determining the same plaintiff was chargeable with his proportionate share of a sum which the firm subsequently paid to the United States to settle a claim for duties arising out of the underweighing of importations of raw sugar by the government weighmasters.

   [Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 718–725; Dec. Dig. § 311.*]

2. CONTRACTS (§ 170*)—PRACTICAL CONSTRUCTION.

   Where a contract is ambiguous, the practical construction placed thereon by the parties may be considered in determining their intent.

   [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 753; Dec. Dig. § 170.*]

3. PARTNERSHIP (§ 311*)—DISSOLUTION AGREEMENT—VALUE OF INTEREST—LIABILITIES—DEDUCTION.

   Where under a partnership dissolution agreement the continuing partners in ascertaining plaintiff's interest were authorized to deduct all existing liabilities, they were not limited to the deduction of liabilities entered on the firm's books.

   [Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 718–725; Dec. Dig. § 311.*]

4. PARTNERSHIP (§ 311*)—DISSOLUTION—SETTLEMENT AGREEMENT—INDEBTEDNESS.

   A provision of a partnership dissolution agreement that the continuing partners should assume and discharge all debts, liabilities, and obligations of the firm was merely effective to establish a rule of convenience to the continuing partners in settling the old firm's obligations, and did not preclude them from charging the outgoing partner with his proportion of a debt which existed, but was unknown at the time of dissolution, and which was subsequently paid.

   [Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 718–725; Dec. Dig. § 311.*]

5. PARTNERSHIP (§ 311*)—DISSOLUTION AGREEMENT—ACCOUNTS.

   Where a partnership dissolution agreement provided for payments to the retiring partner in accordance with his interest through a considerable period of time, statements rendered to him during such time, which contained no reference to an indebtedness which was unknown to the continuing partners, but which they were subsequently required to pay, were not in the nature of accounts stated, so as to necessitate an action by the continuing partners to set such statements aside for fraud or mu-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tual mistake, in order that such retiring partner might be subsequently charged with his proportion of such claim.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 718–725; Dec. Dig. § 311.*]

Appeal from Trial Term, Kings County.

Action by James N. Jarvie against Christina Arbuckle and another, as administrators of John Arbuckle, deceased, and against William A. Jamison individually. From a judgment dismissing the complaint on the merits, plaintiff appeals. . Affirmed.

Argued before JENKS, P. J., and BURR, THOMAS, STAPLE-TON, and PUTNAM, JJ.

Lewis H. Freedman, of New York City (Adrian H. Larkin and Albert Stickney, both of New York City, on the brief), for appellant.

William N. Dykman, of Brooklyn, for respondents.

BURR, J. From January 1, 1898, to June 1, 1906, plaintiff John Arbuckle, William A. Jamison, and William V. R. Smith were co-partners, carrying on business in the state of New York and elsewhere. In the state of New York the business was conducted under the firm name of Arbuckle Bros. On the latter date the firm was dissolved, plaintiff retiring therefrom on that date, and Smith a few days later.

[1] In anticipation of such dissolution and the continuance of the business by Arbuckle and Jamison, on April 4, 1906, plaintiff entered into an agreement in writing with them by which they obligated themselves to pay him: (a) "The amount of the value of his share in the copartnership property, taken as of January 1, 1906"; (b) a lump sum agreed upon as $2,000,000 "for his interest in the business, trade-marks and good will of the firm and to represent the agreed amount of his share in the appreciation of the value of the copartnership properties over the amount shown by the books"; and (c) another lump sum agreed upon as $166,666.66, with interest from January 1, 1906, until June 1, 1906, computed at the rate of six per cent. per annum. This was stated to "represent his interest in the five months' business for the year 1906." To facilitate a determination as to the value of plaintiff's share "in the copartnership property" and a distribution of such property among the parties entitled thereto, the agreement of dissolution contained a further provision that certain properties of the firm, situated in Texas, Missouri, Colorado, and Nebraska, should within two years be sold by Arbuckle and Jamison, and the net proceeds as received should be distributed among the parties to the dissolution agreement "in accordance with their respective interests in the copartnership of Arbuckle Bros.," that "all shares of stock or other securities belonging to the copartnership" should "be distributed among the partners in kind in proportion to their respective interests in the copartnership," and that "all of the remaining assets of the copartnership" should "be taken over by the said Arbuckle and Jamison as of January 1, 1906, and at the inventories value thereof on that date." The sum to be paid plaintiff in money was to be paid to him in four installments of 25 per cent. each, on the 1st days of June and

December, 1906, and the 1st days of June and December, 1907, respectively. The agreement contained this further provision:

"The said Arbuckle and Jamison agree to assume, pay and discharge all debts, liabilities and obligations of the copartnership and to assume all outstanding leases, agreements and contracts of said copartnership."

Thereafter Arbuckle and Jamison entered upon the performance of the terms and conditions imposed upon them by said dissolution agreement, and caused computations to be made from the books of the said firm of the value of plaintiff's share in the copartnership property other than the property in the foreign states specifically referred to, the trade-marks and good will appraised at a fixed sum, the stocks and securities to be distributed in kind and the profits for the fractional part of the year 1906. On the dates specified in 1906, and again in 1907, they sent to plaintiff statements showing the amounts which then appeared to be due from the firm books, with checks making appropriate payments as shown by such statements. From August 1, 1898, and during all of the remaining period of the existence of the copartnership, Arbuckle Bros. were engaged, among other things, in the importation of raw sugar and the refining thereof. Upon this raw sugar certain custom duties were payable to and collected by the government of the United States. With the raw sugar the exporter sent a statement under oath, and under the signature and seal of the consul at the port of exportation. Upon its receipt Arbuckle Bros. paid tentatively the custom duties computed upon the weight stated in the consular invoice, and upon an assumed strength or purity of 96 degrees, and the sugar was unloaded upon the Arbuckle refining dock. It was then weighed by United States Custom House weighers, and samples were taken, which were tested for strength or purity. By the weights and tests thus made, the officers of the United States government assumed to ascertain and determine the exact duty payable upon each cargo. If the initial payment was too small, Arbuckle Bros. paid the deficiency. If it was too large, the United States government refunded the excess. In the autumn of 1909, the United States government asserted, and the court at Special Term has found, that from 1898 to 1907 the weights obtained by the Custom House weighers were less than the true weights of such raw sugar, and that the amount of duties during said period which should have been paid exceeded those actually paid by the sum of $695,573.19. It was also contended that this underweighing had been brought about by the fraud of certain agents and servants of the firm of Arbuckle Bros., for whose acts the members thereof were liable, and in collusion with the United States weighmasters, and that the members of said firm were answerable, not only for the amount of the duties remaining unpaid, but also to the forfeiture of all of the sugar underweighed, and also to fines amounting altogether to many millions of dollars. The court at Special Term found that neither the plaintiff nor any of his copartners knew of any difference in weights until September, 1909, and that neither of them was personally guilty of any concealment or fraud in connection therewith. The validity of the claim of the United States government was never judicially determined, for in December, 1909, plaintiff and his

former copartners, Arbuckle, Jamison, and Smith, united in submitting to the Secretary of the Treasury a written offer to compromise all civil claims and demands growing out of the importation of raw sugar by said firm, by the payment of the amount of duties claimed to be unpaid, to wit, the sum of $695,537.19. This offer was accepted and the money paid. Of such amount, plaintiff contributed the sum of $156,087.54, which would be the just and fair proportion thereof chargeable to him, provided, as between himself and the defendants in this action, he is liable to pay any part thereof. After the offer of compromise had been accepted, but before the final payment of money in accordance therewith, plaintiff and his copartners entered into an agreement in writing. This agreement (after reciting that by virtue of the dissolution articles of April 4, 1906, plaintiff claimed that no obligation rested upon him to pay any portion of said amount, but that by reason thereof Arbuckle and Jamison should pay the whole of the sum offered and accepted in compromise, and further reciting that Arbuckle and Jamison did not accede to such contention) provided—

"that all payments made by any of the parties hereto shall be without prejudice against each other, that no presumption is raised against any of the parties hereto by reason of such payments."

Thereafter this action was brought against John Arbuckle and William A. Jamison to recover said sum of $156,087.54. Pending the action John Arbuckle died, and it was continued against his administrators. Trial by jury was waived, and from a judgment entered upon a decision of the Special Term in defendants' favor, plaintiff appeals.

We may dismiss without determination respondents' contention that the payment made by plaintiff in connection with his former partners to the United States government was a voluntary payment upon his part, or that the obligation thus discharged was not, strictly speaking, a debt of said firm. We prefer to rest our decision upon the ground that it was plaintiff's duty to his partners to pay his proportionate share of such claim, treating it as a firm indebtedness. We think that the fair construction of that portion of the dissolution agreement, to the effect that plaintiff should be paid "the value of his share in the copartnership property, taken as of January 1, 1906," requires that an accurate account should be taken to determine such value. Upon the credit side of the account should be entered the "inventoried value of the assets" other than those which by the terms of said agreement were to be disposed of by sale, or taken over at a fixed price or distributed in kind. Upon the debit side of the account should be entered all actual debts and obligations of the dissolving firm, whether at the date of such dissolution known or unknown. Plaintiff's proportion of the balance remaining, as fixed by the copartnership articles, to wit, 25 per cent. thereof, was the "value of his share in the copartnership property." This was the purchase price of the "remaining assets" of the firm which Arbuckle and Jamison were to take over. A fixed sum had been agreed upon for "trade-marks," "good will," and "appreciation." Rather than close the books on June 1, 1906, and determine the exact amount of plaintiff's interest in the profits for this

fraction of a year, the parties again agreed upon a fixed sum, which, greater or less, the retiring partner bound himself to accept and the continuing partners obligated themselves to pay. If the value of the "remaining assets" was to be determined by the inventoried value thereof, with no deduction for liabilities, the agreement for dissolution would naturally have provided for the payment of a third fixed sum to plaintiff, namely, his proportionate share of such inventoried assets, disregarding liabilities. It would have been quite feasible in April to determine what the inventoried assets were in the preceding January, since by the partnership articles the books were to be closed and an inventory made on the 31st day of December in each year. That it did not do so clearly indicates that not only inventoried assets but existing liabilities should enter into the computation.

[2] If ambiguity exists in a contract, the practical construction put upon it by the subsequent conduct of the parties thereto is a valuable aid in determining its true meaning. Wald's Pollock on Contracts (3d Ed.) § 451; Winchester v. Glazier, 152 Mass. 316, 323, 25 N. E. 728, 9 L. R. A. 424; Woolsey v. Funke, 121 N. Y. 87, 24 N. E. 191. On three separate occasions prior to December, 1909, defendants rendered to plaintiff a statement as to his interest in the partnership property, each of which statements was accepted by him without protest. In each of these liabilities were deducted from gross assets, and settlements had upon that basis. Plaintiff does not now claim that such statements and the settlements based thereon were erroneous with one exception, which is the subject of another action.

[3] Again, the liabilities which defendants were authorized to deduct were *all* existing liabilities, whether shown upon the books or not. It was not by its terms limited to liabilities entered thereon. If it had been, appellant's case would more clearly resemble State Bank v. Napier, 46 App. Div. 402, 61 N. Y. Supp. 779, affirmed 168 N. Y. 591, 60 N. E. 1121, upon which he greatly relies. Again, the rule of practical construction militates against plaintiff. Upon two of the statements rendered to him, that rendered December 1, 1906, and that rendered June 1, 1907, plaintiff was credited with 25 per cent., his proportionate share of certain accounts which had been charged off to suspense account upon the books of the firm, but had been subsequently collected, and payment of this sum was accepted and has been retained by him. It is true that these items were items of additional credit. But of still greater significance is it that in the first statement rendered, that as of June 1, 1906, there was included an indebtedness of $11,250, which did not appear upon the books of the concern, and which arose in the following manner: Two of the employés of the firm, Turner & Gilmore, in addition to a fixed salary, received as additional compensation an interest in the profits. After the dissolution agreement had been signed, which provided for payment to plaintiff of $2,000,000 for trade-marks, good will, and enhanced value of real estate above the amount at which it was carried on the books, these employés contended that they also were entitled to participate in this "appreciation" to the extent of their percentage interest in the profits. This contention was conceded, and subsequently to the execution of the dissolution

agreement they were paid the sum of $45,000 on account thereof, and thereafter one-quarter of this indebtedness, which nowhere appeared upon the books of the· concern until May, 1906, was charged as a liability against plaintiff's account, and included in the statement rendered to him June 1, 1906, and to this charge no objection was made by him. Again, in the statement rendered as of December 1, 1906, another liability, although smaller in amount, existing in 1904 and 1905, not entered in the books nor known to any of the parties to the agreement to exist prior to August, 1906, was entered as a firm liability, and 25 per cent. thereof charged to plaintiff and included in the statement then given to him, and again he acquiesced in, or at least never objected to, the same, and the check then paid to him was for the balance remaining after deducting such liability.

[4] Neither does the provision of the agreement that "Arbuckle and Jamison agree to assume, pay and discharge all debts, liabilities and obligations of the copartnership" prevent them from charging to plaintiff his proportionate part of the firm's obligation to the United States government in their settlement with him. The usual rule of law as to the liquidation of partnership properties is in this instance confirmed by the provisions of the partnership articles, to the effect that in the event of the withdrawal of a partner, the remaining partners shall pay to him "his net interest in the business * * * as of the date of his withdrawal, * * * taking stock for that purpose." It seems quite clear that it was not the intention of the parties by this clause of the dissolution agreement to vary this well-established rule. Rather the purpose was to establish a rule of convenience to the continuing partners in settling and liquidating the obligations of the former firm. It may be that it made the continuing partners liable as principals and the retiring partner as surety, as between themselves. Morss v. Gleason, 64 N. Y. 204. It may be that the assumption and agreement of Arbuckle and Jamison to pay *all* debts applied to those unknown as well as known. But this by no means requires that if a debt, unknown at the time of dissolution, is paid, plaintiff should not be charged in settlement with his proportion thereof.

"An agreement to pay debts is not the same thing as an agreement to adopt a certain figure as a partner's credit balance without proper deduction for debts."

[5] Nor is there any force in the contention that the statements rendered in June and December, 1906, and June and December, 1907, are in the nature of accounts stated, so that an action by defendants to set them aside on the ground of mutual mistake or fraud is necessary before plaintiff can be called upon to pay any portion of an indebtedness not included therein. In the first place, defendants are not seeking to set such agreements aside and recover from plaintiff an overpayment because of the existence of a debt then unknown.· Plaintiff has himself paid a portion of a debt which he says he should not have paid, and is seeking to recover the amount thereof from defendants. But if it is urged that the agreement, which was entered into after compromise with the United States government had been agreed up-

on, and before the money was actually paid, precludes this contention—

"the rule is well established that a settled account may be impeached and readjusted by proof of unfairness, fraud, or mistake in law or fact.  *  .*  * It may not be necessary in such cases to open the whole account, but the mistake can be corrected and the rights of the parties readjusted as to such mistake."   Conville v. Shook, 144 N. Y. 686, 39 N. E. 405; Ballard v. Beveridge, 171 N. Y. 194, 63 N. E. 960; Carpenter v. Kent, 101 N. Y. 591, 5 N. E. 787.

Both of the clauses of the dissolution agreement, namely, that relating to the assumption of debts and that which requires that plaintiff shall be paid "the value of his share of the copartnership property," should be read together. If a single debt is omitted in the computation which should have been included, and settlement is made upon the basis thereof, plaintiff would be overpaid the value of his share of the copartnership property to the extent of one-quarter of such omitted debt. The law does not require such construction of the dissolution agreement as would permit this, and good morals forbid it.

The judgment appealed from should be affirmed, with costs. All concur.

Argued before JENKS, P. J., and BURR, THOMAS, STAPLETON, and PUTNAM, JJ.

